LILLIAN RUTH ARTHUR, respondent,

*v.*

CLARENCE J. ARTHUR, appellant.

[Decided May 18th, 1925.]

On appeal from a decree of the court of chancery advised by Advisory Master Grey, who filed the following opinion:

"The petitioner in this cause filed her petition January 30th, 1922, for divorce, in which she charged her husband with adultery. Paragraph 2 of the petition reads as follows:

"'2. Defendant, since his marriage to your petitioner. and on October 4th, 1921, and on October 25th, 1921, and on divers other days in the month of October, 1921, committed adultery with one Viola Sims, at Camden, in the county of Camden; and at various other times and at various other places, said defendant committed adultery with divers other women, in Camden, New Jersey.'

"The petition alleges that the parties were married on November 23d, 1912; that they were *bona fide* residents of the State of New Jersey when the cause of action arose, and have ever since continued to be so; that petitioner has no means of support except from her own exertions, and that three children were born of the marriage, and were then living, and were named in the petition, two boys, of five and two years, respectively, and a girl of four years of age.

"The prayer is that the marriage be dissolved according to the statute, and that the defendant be compelled to support the children, and that the petitioner be awarded their custody, and be permitted to resume the use of her maiden name, and for further relief.

"To this petition the defendant filed an answer denying its allegations.

"On the issues thus raised, hearings were commenced before me, as advisory master, on November 8th, 1922, and four

hearings were had until October, 1923, when the defendant's counsel applied for leave to amend the answer by adding a cross-petition charging the petitioner with adultery.  An order was entered for that purpose October 23, 1923, and the cross-petition charged the petitioner with adultery in this language:

"'1. Petitioner, Lillian Ruth Arthur, the defendant against this cross-petition, did, since her marriage to cross-petitioner, and on or about June 29th, 1921, at or near Blue Anchor, in Camden county, New Jersey; and on or about July 24th, 1922, at 323 Berkeley street, in the city of Camden, cross-petitioner's residence; and on or about August 17th, 1922, at 727 Walnut Street, in the city of Camden, the residence of Clement T. Branch, and at other times and places in said months, wickedly disregarding the solemnity of her vows and the sanctity of the marriage state, commit adultery with the said Clement T. Branch.'

"The cross-petitioner prayed a dissolution of the marriage according to the statute, and that he be awarded the custody of the three children.  On the additional issue thus raised the cause proceeded, and, after three additional hearings, was closed on December 19th, 1923.  Argument was heard on February 15th, 1924.

"I will discuss the testimony and proofs as though the answer and cross-petition were filed by the defendant as one pleading, at the beginning of the case.

"I find as a fact that the petitioner and defendant were lawfully married, and were *bona fide* residents of this state at the time the alleged cause of action arose, and have ever since continued to be residents of this state.

"The petitioner, Lillian Ruth Arthur, and her husband, Clarence J. Arthur, are colored people of means and position in their community.  The husband's earnings are upwards of $1,500 a year as a member of the police force of the city of Camden.  He and his wife and children always appeared before the court well dressed and well mannered.  The neighbors and other witnesses accompanying they were of the same class.

"For the sake of brevity and clarity, I will discuss the testimony in the inverse order in which it was presented.

"By the cross-petition, the defendant accused his wife of adultery with Dr. Clement T. Branch. This man has been a physician for twenty-three years, and is practicing among the colored people in the city of Camden. He is, himself, a colored man, and impressed me as having ability and character. His testimony was clear and convincing, as was the corroborating testimony of Mrs. Arthur. The testimony against him on this charge was given principally by Clarence Arthur, himself. His testimony fails to show any acts of affection or any feeling, other than friendship, between his wife and Dr. Branch. The relation of Mrs. Arthur with the Branchs was, obviously, close and neighborly. Dr. and Mrs. Branch, with the consent of Mr. and Mrs. Arthur, had the custody and care of the oldest child, who lived with them for some time prior to the suit and was living with them until his death, by accident, outside of the court house after one of the hearings in this cause. Dr. Branch had an automobile, and occasionally took out Mrs. Arthur and the children, accompanied some times by his wife, some times by other people.

"The only act testified to by Arthur that might have indicated affection between Dr. Branch and Mrs. Arthur, is found at the bottom of page 227, *et seq.*, of the typewritten case. He there says he ran upstairs to his room, got in a closet, and kept the door open on a crack; that Dr. Branch and Mrs. Arthur brought the children upstairs and laid them on the bed, and came downstairs. He followed and stood on the stairway looking into the hallway, apparently downstairs. He there saw Dr. Branch's arms around his wife's shoulders, and saw him kiss her, and heard her say, 'Oh, don't! Clarence came up in the house, and he may be in the house,' so Branch went out the door and she stood and talked to him. Then Arthur went upstairs to the back room. Presently, his wife came upstairs and lit the gas, and while she shut the door in the room, he says, 'I sneaks up and goes downstairs in the dining-room about half an hour, then I go to the front door and open it easy and slams it.' I walked upstairs and said, 'Honey, how long you been in?' Afterwards, they retired, and he attempted to have intercourse with her. She declined,

and he inquired why, and she said, 'Clarence, I will tell you; I think you ought to give me some protection, &c.,' and he wound up his testimony on this point by saying, 'I wouldn't leave her suspicion anything happened between her and Dr. Branch that night,' meaning, I suppose, that he would not let her suspect that he had observed her and Dr. Branch that night.

"This is the only testimony I can find in the case in the least evidential of any affection, or demonstration of it, between Mrs. Arthur and Dr. Branch. I doubt its truth. I do not believe that Clarence Arthur, who is taller, larger and younger than Dr. Branch, would have acted as he testified he did, had Dr. Branch and his wife acted as he testified they did. To sneak around, as he expresses himself, when an older, weaker man was hugging and kissing his wife in his own house, and allow him to get away, then to fool his wife into believing that he did not know that Branch had been there, and then to seek intercourse with her, is not, in my judgment, the way a normal man would have acted. This testimony is not supported by any other witness, nor is there any testimony of similar character, which could be considered corroborative. On the contrary, Estella L. Gaudian, a white woman employed as a detective by Clarence Arthur, swears that, although she followed Dr. Branch and Mrs. Arthur about and observed them at different times in an automobile driven by Dr. Branch, and saw Mrs. Arthur getting in and out of the car, yet there was not any demonstration of affection, or indication of their having been together in any disorderly places, or guilty of any disorderly or unbecoming conduct. Why this witness was called by the husband I fail to comprehend. She seemed anxious to besmirch Mrs. Arthur's character, but was unable to discover any damaging facts.

"Mrs. Branch, wife of Dr. Branch, testifies that she and the doctor and the Arthurs were very friendly before the suit was commenced, and afterwards until Clarence Arthur filed the cross-petition; that they continued thereafter to be very friendly with Mrs. Arthur; that she saw Mrs. Arthur nearly

every day, and that her own relations with Dr. Branch were absolutely harmonious; that she never suspected there was anything wrong between the doctor and Mrs. Arthur.

"Dr. Branch testified that the first he heard of this suit was when Arthur came to his house, and, in the presence of his wife told him about the suit, and threatened him that if this case went to court he was going to accuse Dr. Branch of intimacy with his, Arthur's, wife, and that he would take back his boy, Johnny. This testimony was corroborated by Mrs. Branch. The case did go on; Arthur never did take the boy back, but the cross-petition referred to was brought several months afterwards by amendment to defendant's answer.

"In my opinion, the allegations in the cross-petition are not supported by the proofs, and I will advise a decree dismissing it, with costs.

"On the main case presented by the petition of the wife and the denial of the allegations by the husband, he is charged with the commission of adultery with Viola Sims, in October, 1921, at Camden, and at other times and places, with other women, in Camden, New Jersey.

"The witnesses Bert Mahan and Edith Welsh say that Clarence Arthur kept a disorderly house at 224 Line street, and later for four or five days at 323 Berkley street, all in the fall of 1921. Bert Mahan was the runner for the house, and was paid on some occasions by Arthur, and on others by the inmates of the house, who were Edith Welsh and a woman called Nellie Sims. Mahan testified that Nellie Sims and Clarence Arthur were in partnership in the business; that Arthur himself frequented these houses, which he characterized as disorderly houses, and other houses of like character, of which there were many in the neighborhood; that Clarence Arthur was very friendly with Nellie Sims at both these houses; that he saw Arthur with his arms around Nellie Sims. Edith Welsh testifies to the same effect, and also that Arthur was very friendly with Nellie Sims; that she had seen 'Nellie hugging and kissing him often;' that they seemed jointly interested, financially, in the business; that one night, when she came to the Berkley street house, the door was locked;

she knocked, and after a few minutes Arthur came downstairs and let her in, and then she went upstairs and found Nellie in her bedroom with all her things on; that this occurrence was the latter part of October or the 1st of November, 1921, and was at night, about seven-thirty or eight o'clock; after that they all sat downstairs, with Bert Mahan, for a couple of hours, then Arthur went out and came back about twelve o'clock, and after that she left, leaving Clarence Arthur and Nellie Sims in the house.

"Ira Hall testified that he was familiar with the conditions existing as testified to by the other witnesses at the Line street and Berkley street houses; that he knew these girls, Edith Welsh and Nellie Sims, and that Clarence Arthur visited the houses; that he had seen him there many times; that the houses were used for disorderly purposes; that Bert Mahan was a runner for the houses; that the way the Berkley street house, which was Arthur's residence, happened to be used, as indicated, was that Arthur took his wife and children over to relatives in Philadelphia, and in their absence used the house for disorderly purposes. He testified that he had a conversation with Arthur [Hall then being a policeman on that beat] to the effect that there were no disorderly houses in the Third ward at that particular time, and Arthur said he thought he would open his house [which was in the Third ward] and send his wife to Philadelphia, and have Edith Welsh and Nellie Sims up there. He goes on to say that Arthur did this, and that he, Hall, had 'no business interfering, because there were twenty-seven disorderly houses in the Fifth ward, and I didn't think I had a right to close his.'

"Mrs. Arthur testified that in November, 1921, she was away four days visiting her sister in Philadelphia, and that when she returned to their house, 323 Berkley street, there was a lot of soiled linen and cigarette butts and glasses about, and the house was upset.

"The three witnesses, Bert Mahan, Edith Welsh and Ira Hall, whose testimony has been examined, are all of low character, as their testimony indicates. Hall was a policeman, afterwards discharged upon trial for conduct unbecoming an

officer. While these witnesses are of low character, the mere fact that they are such does not affect the credibility of their testimony. *State* v. *Tomasi, 69 Atl. Rep. 214* (at *p. 216*); *Paul* v. *Paul, 37 N. J. Eq. 23.* If this testimony is to stand, it is sufficient to sustain the allegations of the petition.

"It, therefore, remains to consider whether this testimony contradicted, or sufficiently so, to cause the petitioner's case to fall.

"Arthur testifies that he knew Bert Mahan; that he was soliciting soldiers for a police officer and a woman in the house on Line street. He denies that he was in partnership with the woman Sims, and says he had nothing to do with running a disorderly house in Camden; that he never paid Mahan anything, and was not engaged in soliciting people to go to these disorderly houses; that he was a constable. When told on the stand that Mahan said he had seen Arthur sitting on a lounge with the Sims girl, with her arms across his shoulder, Arthur answers, 'I don't believe he ever did; he seen me in the house, but never on the lounge.' He says the next time he was in the house, they were cleaning up the Fifth ward, when 'I got a whiff they were after Edith and Viola Sims, and I came down and I says, "Hall, listen, Hall, they are after Edith; you had better get her out of town;" and he moved her from the Line street house around to the Second street house.'

"The testimony of Edith Walsh that she saw Arthur coming downstairs and this Sims girl with him, was called to his attention. The witness asked, 'Where was that?' and upon being told it was one of these places, Arthur said, 'I can't remember being there; I don't remember being in any door at all when I came downstairs.'

"In view of his previous testimony, above referred to, he makes this remarkable statement, 'I don't know anything about the Sims woman; the only one I know is the Welsh woman; I don't know anything about the Sims woman; never seen her.' Afterwards he said, 'I don't know her.' Then, when asked, 'Do you know the Sims girl, or don't you?' he says, 'Only when I see her.' He then says that he saw her

several times on the street, and several times at a window in a house on Locust street; that he did not know anything about the Viola part, that he knew her just by the name of 'Sims.' He admits that his wife went to Philadelphia for a few days from the house at 323 Berkley street. He was again asked whether he recalled Edith Welsh banging on his door, and coming down and the Sims woman being upstairs: '*Q.* You don't recall that at all? *A.* I don't know.'

"The testimony of Arthur, thus attempting to contradict the petitioner's witnesses, is indirect, confused and contains admissions which bear out to some extent the petitioner's position.

"Defendant's counsel made a great deal of the argument and in his brief of the fact that the Sims woman was named 'Viola Sims' in the petition, but was called 'Nellie Sims' by the petitioner's witnesses. I cannot see that this argument has any weight. Arthur, himself, calls her Viola Sims sometimes, and again he says he did not know her by any first name, and only as the Sims woman. It is perfectly clear to me that the Sims woman, by whatever name she was called, was the same person referred to in the pleadings, the testimony of the petitioner's witnesses, and that of Clarence Arthur himself.

"No other witness than Arthur is called in denial or contradiction of the petitioner's witnesses, and on this branch of the case I find that the allegations of the petition are sustained by the petitioner's proofs.

"This finding is strengthened by testimony that in December and January, just prior to the commencement of the suit, Arthur had a venereal disease. Mrs. Arthur testifies that she first discovered his condition when she saw her husband treating himself in December, 1921; that she saw Dr. Branch's name on the medicine; that she went to Dr. Branch and he informed her that Arthur had consulted him, and was suffering with a venereal disease, and advised her to have no sexual relations with him. Mr. and Mrs. Arthur had not been living together matrimonially since September, 1921, and she had not contracted the disease.

"Dr. Branch testified that Arthur first came to see him about this trouble about Christmas, 1921; that he examined him thoroughly, and told him he was suffering with a venereal disease, and gave him medicine and prescribed a treatment. Arthur returned for additional medicine and treatment January 8th, 1922. That was the last time he applied to Dr. Branch for medical aid.

"If this testimony is true, when connected with the previously discussed testimony as to Arthur's frequenting disorderly houses, he may have contracted the disease in October or November, 1921, and after sexual relations with his wife had ceased.

"Against the testimony of Mrs. Arthur and Dr. Branch, Arthur denied having any disease and having consulted Dr. Branch. There was negative testimony by Arthur's father, at whose house he lived after the suit was commenced in January, 1922, and by his brother, who roomed with him there, and his mother, who washed his bed clothing and linen, that there was no signs of such a disease—no discharge or staining of bed clothes, underclothes, &c.

"Dr. Lippincott was called on behalf of the defendant and testified that he had examined Arthur as to his physical qualifications for the police force on March 22d, 1922, and that he found him free of venereal disease. He testified, however, that if Arthur had such a disease in December, 1921, and was treated by Dr. Branch, as Branch testified he prescribed for and treated him, and if Arthur kept up such treatment for even as short a period as a month, he could have been cured of the disease in such a way that Dr. Lippincott would not have been able to discover, on March 22d, 1922, that he had had the disease three months before. He also testified that it was quite possible for Arthur, if suffering from the disease, to so care for himself that no stains or discharge would appear on his clothing or bed linen.

"I conclude, therefore, that Arthur had contracted such a disease, and was suffering from it in December, 1921, and January, 1922.

"There was also testimony by Ira Hall that he loaned Arthur a key to his house, and that, on his return to the house the next morning, he found Arthur, John Auletto, Edith Ellis and a woman named Mary all together in a nude condition in one bed. Arthur denied this, and Auletto and Edith Ellis deny that Arthur was present. I make no finding on this matter, as it is unnecessary to the disposal of the case.

"The only remaining question is whether the adultery proven against Clarence Arthur was condoned.

"Arthur testifies that three days after the papers were served on him in this suit, he followed his wife down to her mother's at Fredericksburg, Va.; that he went to her mother's house and asked for her, and she came out; he told her he had a room for her at Scott's; that Scott's was 'like one of these country boarding-houses;' that his wife had lumbago and he carried her over to Scott's; that he registered there for them both; that they stayed there all night together in the same room, and that he had marital relations with her; that he spent the next day with her and her family and friends; that he left the next evening on the seven o'clock train, she saying that if he would get a home and fix it for her, she would come back; that that was the last time he ever stayed with his wife at night.

"This testimony was denied by Mrs. Arthur to the extent that Arthur stayed with her all night and had marital relations with her. She said that he did come to Fredericksburg, saw her about eleven o'clock that night, and asked to see the children; that the children were in bed, and he left in about half an hour; he returned the next morning about eight o'clock and stayed until seven o'clock in the evening.

"Mrs. Scott, who kept the so-called boarding-house, testified that Arthur was there on two occasions; that the first time he came she was away and did not assign a room to him, but saw him leave in the morning; that the second time, she was there when he arrived and when he left; that she did not see Mrs. Arthur with him either time; that she does not keep a register in her house, and never has kept one.

Maria Richards, daughter of Mrs. Scott, testified that she lived at the hotel kept by her mother; that she received Arthur at the time of his first visit and assigned him a room; that Mrs. Arthur was not with him, and did not occupy the room with him that night; they did not keep a register; she did not see Arthur when he was there the second time.

"On this testimony I find that Mrs. Arthur did not condone her husband's adultery, and that such defense to her suit falls.

"On the whole case, therefore, I find that the allegations of the petition are sustained, and that the defendant has not proven the allegations of his cross-petition, and that his defense to his wife's case, of condonation, has also not been proven. I will advise a decree for petitioner, and that defendant's cross-petition be dismissed.

"It remains to determine the question of alimony and counsel fees.

"The proofs were that Arthur is a policeman of the city of Camden, with an income of $127.40 per month, or $1,528.80 per year. From this sum he should pay his wife sufficient for her support and for the support of the two children, a girl of six years and boy of four years. The oldest child, who was being cared for by Dr. and Mrs. Branch, was killed in an accident in front of the court house just after one of the hearings. I had already heard counsel as to the amount of the alimony and counsel fee. I will allow the wife $50 per month for the support of herself and the two children, and I will allow a fee of $250 to petitioner's counsel for the extensive and continuous services rendered his client in this case."

*Mr. Patrick H. Harding,* for the respondent.

*Messrs. Wescott & Weaver.* for the appellant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Advisory Master Grey.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PAR-KER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, VAN BUSKIRK, CLARK, MCGLENNON, KAYS, JJ. 14.

*For reversal*—None.